# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 2008 | **DATE** | September 27, 2000 |
| **CASE TITLE** | Darovec Marketing Group v Bio-Genics, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

Memorandum opinion and order entered. Accordingly, defendants' motion for summary judgment is granted. Defendant Tuck's motion to dismiss is deemed moot. Defendants' motion to strike is deemed moot.

(11) ☐ For further detail see order attached to the original minute order.

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | **Document Number** |
| X | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | SEP 28 2000 | | |
| | Docketing to mail notices. | | date docketed | | 70 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | | date mailed notice | |
| GDS | courtroom deputy's initials | | FO-7 FILED FOR DOCKETING 00 SEP 27 AM 11: 09 | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAROVEC MARKETING GROUP, INC., an Illinois corporation, JOSEPH M. DAROVEC, and HEATHER L. HARRINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> BIO-GENICS, INC., a Utah corporation, d/b/a E'ola International, FRED ROGERS and BERT TUCK, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) No.   98 C 2008 <br><br> Judge Robert Gettleman |

**DOCKETED**
**SEP 2 8 2000**

## MEMORANDUM OPINION AND ORDER

In this diversity action, plaintiffs Darovec Marketing Group ("DMG"), Joseph Darovec ("Darovec") and Heather Harrington ("Harrington") have filed a fourth amended complaint alleging that: Bio-Genics, Inc., d/b/a/ E'ola International ("E'ola") and Fred Rogers ("Rogers") defamed plaintiffs when they published an "Official Memorandum" ("the memorandum") to E'ola distributors (Counts I and II); defendant Bert Tuck ("Tuck") defamed plaintiffs when Tuck republished the memorandum (Counts III and IV); and E'ola breached its distributorship contract with DMG when E'ola terminated the DMG distributorship (Count V) . Currently pending before the court are three motions:  1)  defendants' motion for summary judgment on all counts; 2) Tuck's motion to dismiss Counts III and IV pursuant to Fed. Civ. P. 12(b)(2) and 15(c)(2); and 3) E'ola's and Rogers' motion to strike portions of plaintiffs' summary judgment exhibits and affidavits.  For the reasons set forth below, the court grants defendants' motion for summary judgement on all counts and disposes of this action in its entirety.

Plaintiff DMG is an Illinois corporation. Plaintiffs Darovec and Harrington are officers

of DMG and Illinois residents. Defendant E'ola is a Utah multi-level marketing organization

that sells personal care and weight loss products through a network of independent distributors.

Defendant Rogers is E'ola's "Compliance Manager." Under E'ola's distributor network, when a

new distributor is added to the company, she is placed below the distributor who recruited her

into the company and, as such, she becomes a member of the recruiting distributor's "downline"

while the recruiting distributor becomes the her immediate "upline." Harrington/DMG were

E'ola independent distributors from May 1996, to December 1, 1997.[2] Defendant Tuck was an

E'ola independent distributor during that time and was upline from the DMG distributorship in

the E'ola network.

The E'ola distributorship agreement incorporates the terms of the E'ola Policies and

Procedures manual ("E'ola policy") and gives E'ola the right to terminate distributors "at any

time" if they breach their agreement or engage "in any conduct that may bring disrepute upon

---

[1] The following facts have been found to be undisputed by the court. In some instances, facts were deemed admitted by the court when plaintiffs failed to deny them properly in their Response pursuant to Local Rule 56(1). The mere denial of a particular fact without "specific references to the affidavits, parts of the record, and other supporting materials" that allegedly establish a factual dispute is insufficient; and, where a factual assertion is met with such a naked denial the fact may be deemed admitted. Flaherty v. Gas Research Inst., 31 F.3d 451, 453 (7th Cir. 1994). Where the court finds a fact admitted despite some form of denial by plaintiffs, the court will explain the insufficiency of plaintiffs' denial.

[2] Plaintiff Harrington signed an E'ola Distributorship Application and Agreement in May, 1996. On June 23, 1997, Harrington's distributorship was transferred by agreement of Harrington and E'ola to DMG. The court will refer to the E'ola Distributorship Application and Agreement as the "E'ola distributorship agreement." The court will refer to the Harrington/DMG distributorship as the "DMG distributorship."

E'ola." E'ola policy adds to this conduct requirement the following: distributors must, at all times, "act in good faith in [their] dealings with the company, with other distributors and with customers" (Policy 28(B)) and they shall not act "in such a way as to negatively affect the company's image, good name or good will" (Policy 28(E)). Further, distributors are required to "supervise, train and have ongoing communications and coordination with [their] downline" if they choose to establish such a downline (Policy 5(A)) and distributors must immediately refer any inquiries by the media pertaining to E'ola immediately to the company (Policy 23). Distributors are prohibited from "promoting the company's labels or product names in any form of media advertising" including newspapers (Advertising Policy 2(B)), and from "advertising specific prices of any of the company's products" (Advertising Policy 6).

Between May and December 1997, E'ola was contacted at least forty-seven times regarding the DMG distributorship; a minimum of seventeen other E'ola independent distributors and five E'ola customers registered complaints about plaintiffs during this time. E'ola responded directly to each individual who complained. In most instances, Rogers called the complaining individual. Rogers also kept track of all complaints in a detailed log. Throughout the investigation of these complaints, plaintiffs were contacted by E'ola at least nine times to discuss compliance with company policy and/or the complaints made against them. The following is a chronology of the relevant events that occurred during 1997:

1. From March to December, plaintiffs leased "mall carts" at the Spring Hill and Stratford Square malls in the Chicago area. Mall carts, also known as kiosks, are the small display structures in the middle of a mall concourse area. The original lease of the Stratford Square cart, which was subsequently extended, provided for a base monthly rent plus 15%

3

of gross sales at the cart in excess of $6,000. During the time plaintiffs leased this cart, plaintiffs and various distributors downline from plaintiffs sold E'ola products from the cart. Despite agreeing to pay Stratford Square a percentage of their gross sales in excess of $6,000 per month, plaintiffs failed to keep records of the gross cart sales and, in fact, did not ask the other distributors working the cart to report their sales. At the end of each month, Darovec took a "stab in the dark" when filling out the sales report form that had to be turned in to the management at Stratford Square Mall.

2. During this time, plaintiffs and members of their downline (at the insistence of plaintiffs) sold E'ola products from the mall carts for prices significantly below the company's suggested retail price. Plaintiffs sold E'ola's "Liqua Thin" and "Amp II Pro Drops" for $17.50 a bottle or $35.00 a set, which was only slightly above their wholesale costs of $15.00 a bottle and $30.00 a set and well below the suggested retail price of $25.00 a bottle or $50.00 a set.

3. In May Rogers began receiving complaints about plaintiffs. The first complaint was from a distributor who was afraid to reveal his or her identity. Then, Darlene Marsiglia ("Marsiglia"), an E'ola independent distributor downline from plaintiffs, requested that she be transferred from plaintiffs' downline.

4. Thereafter, Harrington was quoted in an article in the Sunday edition of the local newspaper. The article named and discussed the benefits of E'ola's Liqua Thin and Amp II Pro Drops, contained a picture of the Liqua Thin drops, and quoted plaintiffs' selling price of $17.50 a bottle for each product. The article also stated that customers could purchase the

4

product at Randhurst Shopping Center and Spring Hill Mall.[3] The article was brought to the attention of Rogers through a fax sent to E'ola by Lori Atkins ("Atkins"), an E'ola independent distributor who was downline from plaintiffs.

5. Since all media inquiries were supposed to be referred to the company and since any form of advertising was strictly prohibited, Rogers called Darovec twice to speak to him about the newspaper article. Rogers also wrote a letter to Harrington explaining that the article was a violation of several company policies and that plaintiff's involvement, "according to policy, is sufficient grounds for account termination."[4] From that point on, plaintiffs were the subject of an ongoing investigation by Rogers.

6. In June, yet another member of plaintiffs' downline asked to be transferred; Atkins and her husband wrote to E'ola they would not "tolerate being lied to" and that plaintiffs offered no training, assistance, or advice for the previous eight months despite the Atkins' repeated requests. Around that same time, Jean Swaya ("Swaya"), another E'ola independent distributor, wrote to E'ola to register various complaints against plaintiffs.

7. After contacting both Atkins and Swaya to investigate their complaints, Rogers felt that it was essential to try to work out whatever problems existed between plaintiffs and the

---

[3] Plaintiffs were not associated with the E'ola mall cart at Randhurst Shopping Center.

[4] Although plaintiffs take issue with defendant's characterization of the article as an "ad" and assert that the author of the article interviewed a different E'ola independent distributor, plaitiffs do not deny being involved with the appearance of the article, they do not deny the fact that Harrington is quoted in the article, and they do not deny that the article quoted their selling price and location at Spring Hill Mall. Instead, they simply state that, "DMG could not possibly stop [the article's] publication, as it had no control over the publisher." While that may be true, the court finds plaintiffs' denial inadequate to dispute the above conclusions regarding their involvement with the article.

other distributors. To that end, Rogers spoke to Karl Prazak ("Prazak"), a high-ranking E'ola independent distributor who was upline from plaintiffs. Prazak later contacted Harrington during a trip he made to Chicago, but the problems were not resolved.

8. In fact, the problems worsened. On June 27, distributor Diane Forman ("Forman") complained about E'ola's failure to respond to the numerous complaints about plaintiffs. Forman also informed E'ola that due to the fact that the May article quoted a price of $17.50 per bottle of Liqua Thin or Amp II Pro Drops (whereas she was selling sets of the bottles for $45.00) and stated that the products could be purchased from Randhurst Mall, she was forced to close her cart at that mall. Forman wrote, "Our customers feel lied to and cheated. Now we must sell [these products] for wholesale or go out of business . . . [because] our mall was mentioned in [the] article but we never asked for that or were ever informed. Customers now come waving the . . . article!"[5] Rogers contacted Forman to discuss her complaints.

9. In July, numerous complaints were made against plaintiffs by members of their downline. One specific complaint came from Doris Reeves-Skonie ("Reeves-Skonie"), who called Rogers and played a recorded message from her telephone answering machine in which Darovec used profanity and threatened to sue Reeves-Skonie.

10. As a result of these more recent events, Rogers and Mike Brosnan ("Brosnan"), E'ola's Director of Sales and Distributor Relations, spoke to plaintiffs in late July and again

---

[5] Plaintiffs' denial of this statement of fact refers only to the affidavit of Darovec, which states: "The fax Rogers received from Forman on June 17 contains numerous factual inaccuracies." The court is not omniscient and cannot guess which portions of Forman's fax are inaccurate according to plaintiffs. Thus, the contents of Forman's fax are deemed admitted.

explained E'ola's position and reluctance to tolerate plaintiffs' actions, misbehavior and repeated violations of E'ola policy. During that conversation, it was agreed by all that it would be best if Darovec no longer interacted with E'ola distributors or was involved with E'ola except for his ongoing bookkeeping function for Harrington.

11. Despite plaintiffs' assurances, however, E'ola continued to receive complaints. In August, another member of plaintiffs' downline, Patricia Wallace ("Wallace"), requested a transfer.[6] Thereafter, Rogers was informed that another distributor, Michelle Roberts ("Roberts") was forced to mediate a refund dispute between Harrington and a customer by the name of Lynn Gould ("Gould"). Gould later contacted E'ola herself to complain about Harrington's treatment of customers and Rogers followed up by issuing Gould a refund directly from E'ola's corporate office. In addition, Swaya contacted Don Rivers ("Rivers"), owner of E'ola, twice to complain about plaintiffs' conduct.

12. Other calls received by E'ola from late August to mid-September prompted Rogers and Brosnan to contact Darovec and again and reiterate E'ola's position that distributors are expected to comply with E'ola policies and procedures, act professionally and politely to members of their downline and to their customers, and that they are supposed to train and support their downline.

13. Still, the complaints about plaintiffs continued. On September 12, distributor Chris Rogers (no relation) sent Rogers a letter detailing complaints against plaintiffs. The letter

---

[6] Plaintiffs' denial of this point only addresses the truth of the allegations made against them by Wallace. Thus, the court deems defendant's receipt of Wallace's fax requesting a transfer from plaintiffs' downline admitted.

states, "I am sorry to inform you that I have not met one person in this group who has not been injured in some way directly by . . . Harrington or . . . Darovec," and continues with explanations of how plaintiffs had taken or attempted to take other distributors' customers (including two of her own), how they do not adequately train members of their downline, and how they had taken credit for sales made by members of their downline at the carts. Rogers spoke to Chris Rogers thereafter regarding her complaints and also called every other distributor who had made complaints about plaintiffs up to that date to investigate further.

14. On September 16, distributor Lynn Box ("Box"), who was downline from plaintiffs, sent Rogers a fax to inform him that plaintiffs owed her money from her sales of E'ola products from their mall cart and also that, when she told Darovec that she was no longer going to work the cart, he threatened her that her name was on the lease and she would be liable for the rent. Plaintiffs also told Box that if she stopped working the cart, they would no longer help her in the business despite being her immediate upline in E'ola.[7] Rogers followed up the complaints by Box as per his usual practice.

15. The next day, Atkins wrote a letter to Rogers and Reis that stated that although she had positive feelings about E'ola, "if every step of the way I'm going to be undermined and undercut by the very person [referring to Harrington] that is suppose[d] to be helping me [then] forget it." Atkins also reported that Harrington had called her "a disgrace to E'ola"

---

[7]Plaintiffs deny these assertions by stating that the Box fax "contains factual inaccuracies and misstates the truth." Plaintiffs offer no further clarification regarding which facts are inaccurate and which statements are untrue. Thus, plaintiffs have failed to adequately deny the allegations contained in the fax and they are deemed admitted by the court.

because she chose to sell products at their suggested retail price and not at wholesale. Atkins concluded her letter by asking E'ola to take action to rectify "this ugly situation."[8]

16. After these complaints, E'ola's Compliance Committee met to discuss the ongoing problems with plaintiffs. Present at the meeting were Rogers, Reis, Brosnan and Todd Rivers ("Rivers"), E'ola's Vice President. Rogers summarized for the committee members the repeated complaints against, and problems with, the DMG distributorship that were having a detrimental effect on the company. In the end, the committee members decided that Brosnan and Rogers should speak with plaintiffs again.

17. That same week, Rogers received further complaints from Chris Rogers and Reeves-Skonie, as well as complaints from distributors Lauren Magnusson ("Magnusson") and Wayne Ruskoff ("Rushkoff"). Rogers also sent letters to Swaya, Box, Forman, Atkins, Gould, Chris Rogers, and Reeves-Skonie regarding their complaints against plaintiffs. Around this same time, Rogers called each of the distributors who had made complaints to him or other officers of E'ola about plaintiffs to advise them of E'ola's role in assuring compliance with E'ola policies and procedures and that their complaints would be investigated.

18. On October 1, Rogers and Brosnan spoke directly to plaintiffs for more than an hour. During that conversation, Rogers outlined the complaints about plaintiffs that had been made by numerous distributors and customers and informed plaintiffs that they needed

---

[8] Plaintiffs deny this statement by saying the letter is "not completely accurate and contains numerous misstatements of fact." Whether or not this is one of the misstatements to which plaintiffs refer is unknown to the court. Thus, these assertions of fact are deemed admitted.

to address these problems, including sending a letter to their downline that plaintiffs would strictly adhere to E'ola policies and procedures and provide proper support for the organization by eradicating any contention between plaintiffs and their downline. Plaintiffs indicated that they would abide by E'ola's requests.

19. That same day, Darovec sent a letter on E'ola stationary to Gloria Leverence ("Leverence"), an E'ola customer who had requested a refund. The letter read, in part:

> I have received your E'ola product and your letter for a full refund. I called you on Wednesday to give you some further instructions to help you expedite your refund only to have you hang up on me. I am a professional business man [sic] and I will not tolerate such childish actions on your part.

> If you were so concerned about your health, why did you open the bottles? We have many people with elevated blood pressure and thyroid conditions that have experienced substantial weight losses. It appears to me that one of the complications you have in your life is the lack of knowledge of natural herbal healing and of course *YOUR ATTITUDE!*

> I am returning your sales receipt to you. You did not follow the directions on the bottom that instructs you on how to apply for a full refund. I suppose it appeared to [sic] complicated. Upon receiving the receipt completed as instructed, I will credit your charge card $35.00.

(emphasis in original). Darovec says he wrote this letter "to help" Leverence. After receiving Darovec's letter, Leverence forwarded it to E'ola and denied hanging up on Darovec as he claimed. Leverence also stated that, "I really did not appreciate a letter like this when I am a customer to your company."

20. On October 2, Rogers called the following individuals, each of whom had complained to E'ola about being owed money by plaintiffs, and asked whether he was authorized to mention their names in seeking reimbursement from plaintiffs on their behalf:

10

Wallace ($30.00), Box ($287.75), Chris Rogers ($365.00), Reeves-Skonie ($142.00) and Magnusson ($72.00).

21. The next day, Rogers sent a six-page letter to plaintiffs confirming the details of their phone conversation and setting forth the actions plaintiffs had agreed to take. E'ola reiterated its insistence that plaintiffs draft a written statement to the members of their downline assuring that they would follow company policy in the future and provide proper support to the members of their downline. The letter was to be drafted and sent to E'ola by October 15, 1997, for review. Rogers's letter to plaintiffs added that, "Once reviewed, said letter must be immediately mailed and/or faxed to your entire organization." Finally, the letter from Rogers informed plaintiffs that failure to do what they had promised could result in suspension and possible termination of their distributorship. Although E'ola did receive a draft letter from plaintiffs, that letter was never actually sent to the members of their downline as required by E'ola due to plaintiffs' failure to follow-up the matter.[9]

22. The complaints about plaintiffs continued in October. Distributors Diana Ehorn ("Ehorn"), Panzer and Carr all registered separate complaints against plaintiffs. In addition, E'ola was contacted by a customer by the name of Janet Stroncheck ("Stroncheck"). In investigating Stroncheck's complaint, Rogers learned that Harrington had refused to give Stroncheck a refund for an E'ola product that caused Stroncheck to suffer a serious allergic

---

[9] E'ola asserts that it reviewed the draft letter from plaintiffs and gave plaintiffs the go-ahead to send it to their downline on October 9, 1997. Plaintiffs vehemently deny that they were ever given the go-ahead from E'ola. Nevertheless, it is clear from the record that plaintiffs failed to follow-up with E'ola on the matter so that they could keep their promise to send the letter to their downline. As a result, the letter was never sent and E'ola's terms from its October 1, 1997, discussion with plaintiffs were not satisfied.

reaction requiring hospitalization. Although Harrington received express approval from E'ola to give Stroncheck a refund for all of the products she purchased, Harrington agreed only to refund Stroncheck the amount she paid for the one product that had caused her allergic reaction.

23. In early November, another customer, Denise Andrews ("Andrews"), contacted E'ola to inform the company that, although she had told Harrington about her heart problems, Harrington had told her not to worry and had sold the product to her anyway. Andrews used the product as Harrington had encouraged but later experienced severe problems and tried to return the product. E'ola learned that Harrington had refused to give Andrews a refund because the day she attempted to return the product was two days past the 30-day return limit.

24. Shortly thereafter, Rogers reported the status of the complaints to Reis and recommended that plaintiffs' distributorship be suspended pending a hearing by the E'ola Compliance Committee. On November 13, plaintiffs were officially notified of their suspension.

25. Despite plaintiffs' suspension, E'ola still received complaints about them from distributors and customers. In late November, distributors Carol Seibert ("Seibert") and Ehorn contacted Rogers to register complaints about actions taken by plaintiffs. In addition, Stroncheck, one of the customers who had complained previously about not getting a refund from plaintiffs, contacted E'ola to inform them that she still had not received the refund, despite being told my Harrington that it would be sent.

26. Finally, on December 1, 1997, the E'ola Compliance Committee conducted a hearing to determine the fate of the DMG distributorship. Present for E'ola were Rogers, Rivers, Brosnan and E'ola's attorney. Despite knowing about the hearing and being encouraged to attend, plaintiffs' neither attended the meeting nor directly participated in the meeting via telephone. Instead, plaintiffs' attorney called E'ola and, after Rogers summarized the results of his investigation, plaintiffs' attorney read a statement prepared by Harrington and then declined to participate further. The meeting ended with the members of E'ola's Compliance Committee voting unanimously to terminate the DMG distributorship.

27. Following the termination of plaintiffs' distributorship, Rogers authored and transmitted the below memorandum on behalf of E'ola. The memorandum was sent only to affected upline and downline E'ola independent distributors.

December 12, 1997

OFFICIAL MEMORANDUM TO E'OLA INDEPENDENT DISTRIBUTORS

E'ola's commitment to honesty, integrity and excellent service, have and continue to be the core of our corporate office values. In this regard, it has become necessary to inform you that on December 2, 1997, E'ola terminated the distributorship of Mike Darovec and Heather Harrington, dba Darovec Marketing Group, Inc. of Bloomingdale, Illinois. E'ola's action stems, in part, from numerous E'ola policy violations and blatant disregard for the welfare of their fellow distributors.

Accordingly, Darovec Marketing Group, Inc. is no longer authorized to sell, promote, endorse, in any way be affiliated with, or have access to E'ola and its products.

To ensure your continued success, the following individuals will continue to provide you with necessary E'ola support and training. We encourage you to work with each of them on a regular basis. Bert Tuck is your immediate upline sponsor. She can be reached at [phone number]. These proactive leaders are E'ola University graduates, incentive achievers, and outstanding E'ola distributors. E'ola feels their leadership will be a major contribution to your business. And finally, as a member of your

home office support team, feel free to also contact me with any of your questions or concerns. I can be reached at [phone number] or e-mail at [e-mail address].

Respectfully,
E'OLA INTERNATIONAL CORPORATE OFFICE
Compliance Department

Fred Rogers
Compliance Coordinator

Tuck later republished the memorandum to the members of her downline organization at the suggestion of Rogers and E'ola.

On January 6, 1998, Plaintiffs filed their original complaint in this matter in the Circuit Court of DuPage County, Illinois. Defendants later removed the action to this court pursuant to 28 U.S.C. §1441.[10]

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record

---

[10] Because jurisdiction is based on diversity of citizenship, this court will apply Illinois law to the defamation claims. See Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). The parties agree that the choice of law provision in E'ola's distributorship agreement makes Utah law applicable to the breach of contract claim.

14

as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. Although a plaintiff need not prove her case at this stage in the proceedings, she must present some evidentiary facts to support the elements of her claim. Cianci v. Pettibone Corp., 298 Ill. App. 3d 419, 424 (1st Dist. 1998) (citing Benamon v. Soo Line R.R. Co., 294 Ill. App. 3d 85, 87 (1st Dist. 1997)).

## DISCUSSION

For ease of determining the pending claims, the court begins with defendants' motion for summary judgment of Count V, plaintiffs' allegation that E'ola breached its distributorship agreement with plaintiffs.

## I. Count V (Breach of Contract)

Plaintiffs have alleged that E'ola breached the distributorship agreement when it terminated plaintiffs' distributorship. E'ola argues in its motion that plaintiffs had already breached the agreement on numerous occasions prior to its termination of their distributorship,

relieving E'ola of its duty to honor the agreement. The court agrees with E'ola and holds that no reasonable jury could find that E'ola breached its contract with plaintiffs because there is no genuine issue of material fact as to whether plaintiffs had already breached the agreement when E'ola terminated their distributorship. The facts show that plaintiffs violated every E'ola policy described in this opinion.

For example, Harrington's participation in the newspaper article about E'ola products was in direct contravention of Advertising Policies 2(B) and 6, which prohibit a distributor from promoting the company's labels or product names in any form of media advertising and also prohibit a distributor from quoting specific prices of any of the company's products. Even if, as plaintiffs claim, the article was not an ad and they had no control over the publisher, Harrington's quote and the listing of plaintiffs' prices in the article indicate that they did violate General Policy 23, which requires distributors to refer any media inquiries immediately to E'ola. Plaintiffs' ongoing failure to train the members of their downline and remain in contact with those individuals was a perpetual violation of General Policy 5(A), which requires distributors who establish downlines to supervise and have ongoing communications and coordination with their downline sales organization. Also, plaintiffs' failure to follow up with E'ola on the conciliatory letter they agreed to send to the members of their downline, taken alone, would have been grounds for termination per the company's October 3, letter, as was plaintiffs' failure to reimburse the members of their downline for products those individuals sold but for which they never received company credit. Likewise, although Darovec agreed in July that he would not interact with E'ola distributors or get involved with E'ola except for his ongoing bookkeeping function for Harrington, the evidence clearly shows that in September Darovec threatened to sue

16

Box and told her that she could not leave the Spring Hill cart because her name was on the lease, and in October he sent Leverence the nasty refund denial letter.

Further, the record is replete with examples of instances where plaintiffs' conduct brought disrepute upon E'ola, where plaintiffs' dealings with E'ola, other distributors and customers were not in good faith, and where plaintiffs' actions negatively affected E'ola's image, good name and good will, in violation of the E'ola distributorship agreement and E'ola policies 28(B) and (E). Some of these instances include: plaintiffs' admitted disregard of the terms of the lease at Stratford Square Mall; Darovec's use of profanity and threats in his message to Reeves-Skonie; plaintiffs' refusal to repay members of their downline the debts owed to them; plaintiffs' treatment of customers who had requested refunds, especially Darovec's nasty refund denial letter to Leverence; and Harrington's refusal (despite having authorization from E'ola) to refund customers who had medical problems as a result of using E'ola products.

Finally, even if some of the above policy violations were properly disputed by plaintiffs, which they were not, the forty-seven separate complaints received by E'ola are evidence enough that plaintiffs engaged in conduct that brought disrepute upon E'ola, showed lack of good faith, and negatively affected the company's image, good name and good will. Over the course of eight months, seventeen distributors and five customers were upset enough by plaintiffs to complain to E'ola. Most of those complaints were written and some were as much as six pages in length. E'ola did not search out negative information about plaintiffs; each of these individuals came forward due to plaintiffs actions. Thus, given the volume and nature of complaints received by E'ola about plaintiffs, E'ola had no other alternative than to sever its relationship with plaintiffs.

Plaintiffs respond to this evidence by arguing that there are "genuine issues as to the motives of the [plaintiffs'] 'complaining' fellow distributors," but fail to offer any substantiation of ill will harbored by those individuals that was not caused by plaintiffs' improper business conduct. Even if plaintiffs could show ill will on the part of each distributor who complained to E'ola, plaintiffs' argument fails nonetheless because they have not offered any innocent explanation of why five dissatisfied customers contacted E'ola with complaints like, "I really did not appreciate a letter like this when I am a customer to your company." The letter to Leverence alone would be grounds for termination under the terms of the E'ola distributorship agreement and plaintiffs' only attempt to explain that correspondence is a claim that the letter was written to "help" the customer, which it clearly was not. Thus, the court finds no evidence that the complaining distributors or customers were improperly motivated in this case.

Plaintiffs also argue that E'ola violated the implied covenant of good faith and fair dealing because the investigation conducted by Rogers was not "meaningful and fair." As with plaintiffs' previous argument, there is no evidence in the record to substantiate this contention. The implied covenant of good faith and fair dealing recognizes the fact that "each party [to a contract] impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." Brown v. Moore, 973 P.2d 950, 953 (Utah 1998) (internal quotations and citations omitted). A violation of the covenant of good faith and fair dealing gives rise to a claim for breach of contract. Id. at 954 (internal citations and quotations omitted). In examining cases to determine whether a party has breached the covenant of good faith and fair dealing, courts may consider the entire course of dealings between the parties. Id. Courts will not, however, interpret the covenant to make a

better contract for the parties than they made for themselves, nor will courts construe the covenant to establish new, independent rights or duties not agreed upon by the parties. Id.

The E'ola distributorship agreement states that E'ola may terminate a distributorship "at any time" if the distributor "breaches this agreement or engages in conduct that may bring disrepute upon E'ola . . . ." Nowhere in the distributorship agreement does it state that E'ola is required to conduct a meaningful and fair investigation before it may terminate a distributorship. Thus, the court will not construe the agreement as guaranteeing plaintiffs this right. Even so, the undisputed facts demonstrate that the investigation conducted by E'ola into plaintiffs' business conduct was meaningful and fair: Rogers' investigation spanned six months; Rogers personally interviewed every complainant and investigated every complaint made against plaintiffs; E'ola contacted plaintiffs nine times to discuss the allegations made against them; and, finally, Rogers and other officers of E'ola held a hearing so that plaintiffs would have the opportunity to respond to the evidence collected in the investigation. In the court's view, the actions taken by E'ola in this case reflect nothing but good faith and fair dealing and, since plaintiffs have offered no evidence of ill will on the part of Rogers or E'ola, their argument fails.

In a seemingly last-ditch effort to avoid summary judgment, plaintiffs argue that the motion should be denied on the breach of contract count because E'ola participated in "selective enforcement" of its distributorship agreement. They assert: "Even assuming [that] some 'minor' violations [were committed by plaintiffs], flagrant policy and procedure abusers still remain with E'ola as distributors in good standing." The court will not consider actions E'ola may or may not have taken against other distributors, which are collateral and irrelevant to this inquiry. As explained above, the undisputed facts in this case establish that plaintiffs violated the E'ola

distributorship agreement and that, as a result, E'ola was justified under the terms of that agreement in terminating their distributorship. Thus, the court grants defendants' motion for summary judgment on Count V, the breach of contract claim.

## II. Counts I, II, III and IV (Defamation Per Se)

Prior to filing the pending summary judgment motion, E'ola and Rogers moved to dismiss these counts under Fed. R. Civ. P. 12(b)(2) for failure to state a claim upon which relief can be granted. See Darovec Mktg. Group, Inc. v. Bio-Genics, Inc., 42 F. Supp. 2d 810 (N.D. Ill. 1999). In arguing their motion, E'ola and Rogers asserted that plaintiffs' claim must fail because the memorandum does not fit within the recognized actionable *per se* categories and it is subject to an innocent construction. See Id. at 810. The court disagreed with E'ola and Rogers regarding both of those arguments and found that the memorandum did fit within the third category of defamation *per se* because it contained words that impute lack of ability in plaintiffs' trade, profession or business, and because it was not capable of an innocent construction. See Id at 810-817. Specifically, the court concluded that, "a natural reading of the memorandum is that Darovec and Harrington are dishonest and lack integrity, as demonstrated in part by their purported numerous policy violations and blatant disregard for their fellow distributors' welfare." Id. at 817.[11]

Now before the court is defendants' motion for summary judgment on these claims on the grounds that: (1) the statements in the memorandum are true since the plaintiffs were dishonest

---

[11] The court did not find, however, that the statements in the memorandum are defamatory *per se*, as plaintiffs repeatedly argue in their briefs on this motion and supporting documentation. Instead, the court found merely that the allegations in plaintiffs' complaint were sufficient to state a claim for defamation per se.

and lacked integrity; (2) the statements in the memorandum are protected by a qualified privilege that was not abused; and (3) there was no publication of the memorandum since it was sent only to those who had already complained to E'ola about plaintiffs' conduct. Because the court finds E'ola's statements about plaintiffs in the memorandum to be substantially true under Illinois law, the latter two arguments need not be addressed.

First, plaintiffs have failed to offer any evidence of falsity. As the Supreme Court stated, it is well-settled law that where the party opposing summary judgment bears the burden of proof on a dispositive issue, it must offer specific evidence demonstrating a factual basis on which it is entitled to relief. Anderson, 477 U.S. at 256. The party may not rely on conclusory allegations or speculation alone to oppose summary judgment. Anderson v. Stauffer Chemical Co., 965 F.2d 397, 402 (7th Cir. 1992). Defamation actions, by definition, require plaintiffs to carry the burden of proving that the statement made by the defendant was false. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986); Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1228 (7th Cir. 1993) ("A person does not have a legally protected right to a reputation based on the concealment of the truth."). Here, plaintiffs put forth no effort, other than making blanket and sometimes insufficient denials of the truth of the complaints against them, to show that they did not commit policy violations or disregard the welfare of their fellow distributors. Plaintiffs did produce four letters written by distributors and sent to E'ola in October 1997, but these letters show only that, at that time, plaintiffs had not done anything to offend these individuals.[12]

---

[12] One of the letters was written by defendant Tuck and another was written by Paul & Chong Colby, the distributors plaintiffs now describe as "flagrant policy and procedure abusers." None of the letters call into question the policy violations found by the court; they assert only that, at the time, plaintiffs had a good working relationship with four distributors.

As a result, under Illinois law, defendants need only prove that the memorandum was "substantially true" to prevail in its motion for summary judgment. See American Int'l Hosp. v. Chicago Tribune Co., 136 Ill. App. 3d 1019, 1022 (1st Dist. 1985). That is, to prove that a defamatory statement is true, the defendant "need only show the truth of the 'gist' or 'sting' of the defamatory material." Cianci, 298 Ill. App. 3d at 424. As the court stated in Hollymatic Corp. v. Daniels Food Equip., Inc., 39 F. Supp. 2d 1115 (N.D. Ill. 1999), "while normally that determination would be made by a jury, a court can hold that the allegedly defamatory statement is substantially true as a matter of law if no reasonable jury could find that substantial truth had not been established." (citing Cianci, 298 Ill. App. 3d at 424.) After careful examination of the briefs and supporting statements of fact, the court concludes that no reasonable jury could find that substantial truth has not been established in the instant case.

The fact that plaintiffs committed numerous violations of E'ola policy was established above. In addition, the court need not look deep to find undisputed evidence that plaintiffs blatantly disregarded the welfare of their fellow distributors. First, plaintiffs sold E'ola products at prices substantially below the suggested retail price of those products and then participated in a newspaper article making that fact known throughout the Chicago area. This action caused significant harm to other local distributors, especially to Forman, who was forced to close her mall cart as a result of the assertion in the article that the products could be purchased at plaintiffs' price from Randhurst Mall. Also, the facts indicate that plaintiffs lied to at least one fellow distributor, used profanity when dealing with another, threatened to sue another, insulted another by calling her a "disgrace to E'ola," and took another's customers. Plaintiffs also failed to reimburse many members of their downline organization and neglected to train or keep in

22

regular contact with others. As a result of plaintiffs' conduct toward members of their downline organization, three distributors requested that they be switched to another sponsor within a six-month period, and a total of seventeen distributors registered complaints against plaintiffs with E'ola. Thus, there is no genuine issue of material fact as to whether defendants' assertion in the memorandum that plaintiffs blatantly disregarded the welfare of their fellow distributors is substantially true.

Having found that no reasonable jury could conclude that defendants have not established the substantial truth of the statements in the memorandum, the court grants defendants' summary judgment motion on Counts I-IV, the defamation *per se* claims.

## CONCLUSION

Defendants' summary judgment motion is granted on all counts and this matter is disposed of in its entirety. Because the court has granted defendants' motion for summary judgment of Counts III and IV, Tuck's motion to dismiss those claims is moot. Likewise, because no adverse weight was placed herein on any of the exhibits or testimony that was the subject of defendants' motion to strike, that motion is moot as well.

**ENTER:** **September 27, 2000**

**Robert W. Gettleman**
**United States District Judge**